# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

EDMER ROGELIO CABRERA-ALVAREZ,
                    *Petitioner,*

              v.

ALBERTO R. GONZALES, Attorney
General,
                    *Respondent.*

No. 04-72487

Agency No.
A79-812-102

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
June 17, 2005—Seattle, Washington

Filed September 8, 2005

Before: Harry Pregerson, Susan P. Graber, and
Ronald M. Gould, Circuit Judges.

Opinion by Judge Graber;
Dissent by Judge Pregerson

12621

## COUNSEL

Russell W. Pritchett, Pritchett & Jacobson, P.S., Bellingham, Washington, for the petitioner.

Aviva L. Poczter, Office of Immigration Litigation, U.S. Department of Justice, Washington, D.C., for the respondent.

## OPINION

GRABER, Circuit Judge:

Petitioner Edmer Rogelio Cabrera-Alvarez seeks cancellation of removal in order to prevent hardship to his two young children, who are United States citizens. He argues that the immigration judge ("IJ"), in denying him cancellation of removal, interpreted the "exceptional and extremely unusual

hardship" standard, 8 U.S.C. § 1229b(b)(1)(D), in a manner inconsistent with international law and, therefore, in violation of the presumption that Congress intends to legislate in a manner consistent with international law. Specifically, Petitioner argues that the cancellation-of-removal statute must be interpreted consistently with Article 3(1) of the United Nations: Convention on the Rights of the Child ("Convention"), Nov. 20, 1989, 28 I.L.M. 1448, 1459, which states that "[i]n all actions concerning children . . . the best interests of the child shall be a primary consideration."

We deny the petition. Even assuming that the unratified Convention has attained the status of customary international law, Petitioner fails to demonstrate that the agency's interpretation or application of the statute is inconsistent with the Convention.

## FACTUAL AND PROCEDURAL BACKGROUND

Petitioner is a citizen of Mexico who has lived in the United States continuously since 1992, working primarily in agriculture. On November 28, 2002, while in state custody for driving under the influence, he was served with a Notice to Appear that charged him with removability for being present in the United States without having been admitted or paroled. He conceded removability and sought cancellation of removal under 8 U.S.C. § 1229b(b).

Petitioner and his partner, Santa Morales, with whom he has lived since about 1994, have a ten-year-old son and an eight-year-old daughter who were born in the United States. Petitioner and Morales have decided that, if Petitioner is removed to Mexico, the children will stay in this country with their mother or with one of their permanent resident relatives so that the children can take advantage of this country's superior educational and economic opportunities. Consequently, Petitioner would be separated from his children if he were removed.

At a hearing before the IJ, Petitioner testified to the close relationship that he maintains with his children. His children hug and kiss him when they come home from school, and the three tell each other about their days. He helps them with their homework, and they also teach him about what they have learned at school. (The children spoke mostly Spanish before they entered school, but have been learning English through bilingual instruction.) The family eats out and goes to the park together. Petitioner prays with his children and reads them stories at bedtime; he takes them to daycare in the morning. When they were apart recently because of Petitioner's brief incarceration, the children cried and told him on the telephone that they missed him. The children would suffer financially as well as emotionally if he were removed, because Morales' salary would not be sufficient to support her and the children and because Petitioner's employment opportunities in Mexico are limited.

Morales' sister, who sees the children almost every day, also testified. She confirmed that the children are very close to Petitioner, that the children were upset by Petitioner's recent absence, and that they would suffer emotionally if they were separated from Petitioner. Several other friends and acquaintances repeated those views in written statements. Petitioner's son's teacher, for example, wrote that the child "is very devoted to his father and would suffer emotional and psychological harm if his father was no longer at home." Petitioner's daughter's teacher echoed those sentiments.

After considering this evidence, the IJ denied Petitioner's application for cancellation of removal. The IJ explicitly rejected Petitioner's argument regarding the Convention's "best interests of the child" standard, explaining that the Board of Immigration Appeals ("BIA") had made clear that "provisions of international law do not trump" domestic immigration law and noting that Congress "may legislate contrary to the limits posed by international law."

Instead, the IJ applied BIA precedent and concluded that Petitioner had not established "exceptional and extremely unusual hardship" under those cases. The IJ acknowledged that Petitioner had "given very moving testimony" about his love for his children and that, because of Petitioner's difficult decision that the children should stay in the United States, the children would suffer emotionally from the family's separation. But the IJ noted that the children are in "satisfactory health," have spoken Spanish at home, and are doing well in their bilingual education. He also noted that Petitioner has 13 siblings in Mexico, along with his father. He continued:

> While I appreciate the obvious emotional factors involved in this case, I cannot ignore the Service's argument which in part has been that if a candidate for cancellation of removal could simply by stating that he or she would choose to have the child or children remain in this country while he or she would go back to another country and that if such would be deemed to be the requisite degree of hardship as a practical matter the birth of the child would give the candidate for cancellation an in effect right of relief. While some countries have an extremely generous policy of allowing parents of children who were born in that country to remain, for better or for worse our Congress has not seen fit to adopt such a policy in the Immigration and Nationality Act.

Ultimately, the IJ concluded that Petitioner's children faced circumstances similar to those in *Martha Andazola-Rivas*, 23 I. & N. Dec. 319 (B.I.A. 2002), where the BIA denied cancellation of removal, and circumstances unlike those in *Ariadna Angelica Gonzalez Recinas*, 23 I. & N. Dec. 467 (B.I.A. 2002), where the BIA granted cancellation of removal.

A single member of the BIA affirmed the IJ's decision without opinion, pursuant to 8 C.F.R. § 1003.1(e)(4). Consequently, we review the IJ's decision as the agency's final

action. *Falcon Carriche v. Ashcroft*, 350 F.3d 845, 849 (9th Cir. 2003).

### JURISDICTION AND STANDARDS OF REVIEW

On appeal, Petitioner argues that the agency erred by declining to interpret 8 U.S.C. § 1229b(b)(1)(D) in a manner consistent with international law. We have jurisdiction to consider that question of statutory interpretation. *See* 8 U.S.C. § 1252(a)(2)(D) (giving the courts of appeals authority to review "constitutional claims or questions of law" notwithstanding the jurisdictional bar in § 1252(a)(2)(C)); *see also Fernandez-Ruiz v. Gonzales*, 410 F.3d 585, 587 (9th Cir. 2005) (interpreting the amendments to 8 U.S.C. § 1252 enacted in the REAL ID Act of 2005, Pub. L. No. 109-113, 119 Stat. 231).[1] Interpretation of immigration statutes is a question of law that we review de novo, but with deference to the agency's interpretation. *Melkonian v. Ashcroft*, 320 F.3d 1061, 1065 (9th Cir. 2003).

The government argues that we lack jurisdiction because Petitioner essentially asks us to "reweigh a hardship." We dis-

---

[1]Petitioner originally framed his appeal solely as a due process argument. Before the REAL ID Act took effect, our jurisdiction over petitions for review of the agency's discretionary application of the hardship requirement of 8 U.S.C. § 1229b(b)(1) was limited to consideration of "whether the BIA's interpretation of the hardship standard violates due process." *Ramirez-Perez v. Ashcroft*, 336 F.3d 1001, 1004 (9th Cir. 2003). Now that our jurisdiction over legal questions has been expanded, Petitioner's argument need not be so constrained as that of the petitioner in *Ramirez-Perez*, who was required to show that the agency's "interpretation of the hardship standard contradicts congressional intent to such a degree that it violates [Petitioner's] due process rights." *Id.* We decide the legal question without first remanding to the BIA under *Chong Shin Chen v. Ashcroft*, 378 F.3d 1081, 1088 (9th Cir. 2004), because we think the answer clear and see no significant benefit to be derived from the BIA's decision, in the first instance, of a question that calls primarily for the interpretation of international law and a federal rule of statutory construction.

agree. We consider (and ultimately reject) Petitioner's proposed interpretation of the statute, as an abstract legal matter. Therefore, we are answering a question of law, not reweighing evidence.

## DISCUSSION

The presumption that Congress intends to legislate in a manner consistent with international law is a recognized canon of statutory construction. *See Kim Ho Ma v. Ashcroft*, 257 F.3d 1095, 1114 (9th Cir. 2001) (describing "the well-established [*Murray v. Schooner] Charming Betsy*[, 6 U.S. (2 Cranch) 64, 117-18 (1804),] rule of statutory construction which requires that we generally construe Congressional legislation to avoid violating international law"). But, because Congress has the power to "legislate beyond the limits posed by international law," in some cases a statute's text will not be susceptible to an interpretation consistent with international law. *Munoz v. Ashcroft*, 339 F.3d 950, 958 (9th Cir. 2003). Thus, "an act of Congress should be construed so as not to conflict with international law where it is possible to do so without distorting the statute." *Id.*

**[1]** The statute at issue here limits cancellation of removal to those who can demonstrate

> that removal would result in *exceptional and extremely unusual hardship* to the alien's spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence.

8 U.S.C. § 1229b(b)(1)(D) (emphasis added). Petitioner argues that the statute can, and must, be interpreted in a manner consistent with the Convention.

**[2]** Although the Convention is widely (indeed, almost universally) ratified, it has not been ratified by the United States.

*See Roper v. Simmons*, 125 S. Ct. 1183, 1199 (2005) (noting that every country in the world, except for the United States and Somalia, has ratified the Convention). Therefore, the Convention is not "the supreme Law of the Land" under the Treaty Clause of the United States Constitution. *See* U.S. Const. art. VI. For purposes of evaluating Petitioner's argument, however, we assume, without deciding, that the Convention has attained the status of "customary international law." *Cf. Sosa v. Alvarez-Machain*, 524 U.S. 692, ___, 124 S. Ct. 2739, 2767-68 (2004) (reviewing a claim that the principles of a treaty not enforceable in federal courts had "attained the status of binding customary international law"); *The Paquete Habana*, 175 U.S. 677, 700 (1900) (stating that, where no treaty exists, "resort must be had to the customs and usages of civilized nations"); *cf. also Mansour v. Ashcroft*, 390 F.3d 667, 681 n.10 (9th Cir. 2004) (Pregerson, J., dissenting) (noting that, because the United States signed the Convention, it is "obliged under international treaty law to refrain from acts which would defeat the objectives and purpose of the Convention" (internal quotation marks omitted)).

Even when we assume that Congress intended to legislate in a manner consistent with the Convention, we cannot agree with Petitioner that the agency's interpretation of the hardship standard contravenes the Convention. Petitioner relies on Article 3(1), which states:

> In all actions concerning children, whether undertaken by public or private social welfare institutions, courts of law, administrative authorities or legislative bodies, *the best interests of the child shall be a primary consideration.*

28 I.L.M. at 1459 (emphasis added); *see also* Cynthia Price Cohen, Introductory Note to the Convention, 28 I.L.M. at 1450 ("Implementation of the entire Convention is to be governed by the theory of the 'best interests of the child.' "). Petitioner argues that § 1229b(b)(1)(D) should be interpreted

consistently with the "best interests of the child" principle by giving the child's best interests extra weight in balancing the factors relevant to evaluating a hardship.

**[3]** Article 3 of the Convention requires consideration of the "best interests of the child" in all "actions concerning children." The latter phrase, which is not defined in the Convention, is most readily understood to apply to actions that concern children *directly*, such as proceedings involving child custody or the termination of parental rights. In those proceedings, of course, many States explicitly apply the "best interests of the child" standard. *See, e.g.*, Wash. Rev. Code § 26.10.100 (stating that custody shall be determined according to the "best interests of the child"). By contrast, a removal proceeding like the instant one directly "concerns" only the alien parent; it affects his or her children indirectly. Nonetheless, we recognize that the high courts of at least two other nations have held the Convention's "best interests of the child" standard to be relevant to proceedings involving the deportation of a parent. *See Minister of State for Immigration & Ethnic Affairs v. Teoh* (1995), 183 C.L.R. 273, 289 (Austl.) (holding that the phrase "actions concerning children" encompasses a parent's immigration proceeding, particularly where the parent's primary argument involves the hardship to his or her children); *Baker v. Canada* [1999], 2 S.C.R. 817 (holding that the Convention's "best interests of the child" principle was relevant to interpreting the deportation statute, despite the lower court's holding that "deportation of a parent was not a decision 'concerning' children within the meaning of [A]rticle 3" of the Convention).

**[4]** In any event, whatever the relevance of Article 3, it is Article 9 of the Convention that speaks specifically to separations of parent and child. Article 9(1) requires States to "ensure that a child shall not be separated from his or her parents against their will" unless such separation is determined to be in the child's best interests. 28 I.L.M. at 1460. But Article 9(4) contemplates that separation nonetheless may be caused

nonconsensually by a parent's deportation—or, more proximately, by the parent's decision that the child will remain in the country from which the parent is deported.[2] Importantly, Article 9(4) does not attempt to prohibit the deportation of a parent, even though the parent's deportation will result in a separation and is unlikely to be in the child's best interests. Instead, Article 9(4) merely imposes a duty on the State, once parent and child in fact have been separated, to provide "essential information concerning the whereabouts of the absent member(s) of the family." Similarly, Article 10 requires States to make certain efforts to help parents and children living in different countries to maintain contact.[3]

[5] At most, then, the Convention demands that the "best interests of the child" be "a primary consideration" in considering a parent's application for cancellation of removal, not that the child's interests will always prevail. Indeed, at oral argument Petitioner's counsel clarified that he does not ask us to interpret the hardship standard to prevent removal of a parent whenever removal is not in the child's best interests. He argues only that, in balancing the relevant factors, "extra weight" must be given to the best interests of the child. Article 3 requires only that the child's best interests be "a primary

---

[2]The relevant text of Article 9(4) is as follows:

*Where such separation results from any action initiated by a State Party, such as* the detention, imprisonment, exile, *deportation* or death . . . *of one or both parents of the child*, that State Party shall, upon request, provide the parents, the child or, if appropriate, another member of the family with the essential information concerning the whereabouts of the absent member(s) of the family . . . .

28 I.L.M. at 1461 (emphasis added).

[3]Article 10 does not go so far as to require States to provide immigration benefits to a parent or child living in another country. Article 10(1) requires States to deal with requests for entry for the purpose of family reunification "in a positive, humane and expeditious manner." 28 I.L.M. at 1461. Article 10(2) requires States to respect the rights of parent and child to leave and reenter "*their own* country." *Id.* (emphasis added).

consideration," without specifying the precise weight to be given to that consideration relative to others. And, because the child's interests are *already* a primary consideration in the agency's decision whether to grant cancellation of removal, we do not see how the terms of the Convention dictate the amorphous "extra weight" that Petitioner contends is required.

**[6]** When an alien parent seeks cancellation of removal because of exceptional and extremely unusual hardship to a qualifying child, 8 U.S.C. § 1229b(b)(1)(D), that child's "best interests" are precisely the issue before the agency, in the sense that "best interests" are merely the converse of "hardship." In other words, the agency's entire inquiry focuses on the qualifying children, making their interests a "primary consideration" in the cancellation-of-removal analysis. *See Francisco Javier Monreal-Aguinaga*, 23 I. & N. Dec. 56, 63 (B.I.A. 2001) (noting that the agency may consider *only* hardship to qualifying relatives, as distinct from harm to the applicant). The agency considers the children's ages, health, and any special educational needs. *Id.* If the children will accompany the removed parent, the agency considers the "lower standard of living," or other adverse conditions that they might experience in the country of removal, as well as the children's ability to speak that country's language. *Id.* at 63-64. The agency also considers whether the removed parent will be able to provide sufficient financial support for the children and whether the children will be deprived of an opportunity to have an education. *Andazola-Rivas*, 23 I. & N. Dec. at 323-24. The agency considers the location of, and support from, other family members. *Recinas*, 23 I. & N. Dec. at 472. When the children will not accompany the removed parent, the agency must evaluate the hardship caused by that separation. *Salcido-Salcido v. INS*, 138 F.3d 1292, 1293 (9th Cir. 1998) (per curiam). Those considerations, all of which relate to the qualifying child's best interests, are the agency's primary focus.

**[7]** Of course, hardship to qualifying children is not the *only* factor that the agency must weigh in considering an

application for cancellation of removal. Because the statute requires hardship to be "exceptional and extremely unusual," the agency also must weigh the relative quantity and quality of hardship that the parent's removal would cause (or, stated differently, the relative strength of the child's interests as compared with those of other children whose parents face removal). *See, e.g.*, *Recinas*, 23 I. & N. Dec. at 472 ("Here, the heavy financial and familial burden on the adult respondent, the lack of support from the children's father, the United States citizen children's unfamiliarity with the Spanish language, the lawful residence in this country of all of the respondent's immediate family, and the concomitant lack of family in Mexico combine to *render the hardship in this case well beyond that which is normally experienced in most cases of removal*." (emphasis added)); *Andazola-Rivas*, 23 I. & N. Dec. at 322-23 (noting that the petitioner and her children would undoubtedly suffer some hardship upon returning to Mexico, but that "the relative level of hardship that a person might suffer . . . *must necessarily be assessed, at least in part, by comparing it to the hardship others might face*" (emphasis added)). The fact that the agency also considers the relative weight of a child's interests does not mean that the child's interests are not "a primary consideration."

**[8]** Indeed, if the Convention required that the child's best interests be "*the* primary consideration" (as Petitioner sometimes argues) the agency would have to reduce reliance on the comparative assessment. Yet, the agency's rigorous comparative standard—"exceptional and extremely unusual"—is demanded by the statute's text. Any interpretation that required a child's best interests to be weighted more heavily than the comparative assessment would be at odds with the text of the statute. The *Charming Betsy* rule does not require us, nor does it require the agency, to presume that Congress intended a result contrary to the result flowing from clear statutory text. *See Munoz*, 339 F.3d at 958 (holding that, to interpret the statute consistently with international law in the manner that the petitioner proposed, would be "squarely at

odds with the plain language of the statute"). In short, no rule of statutory construction required the agency to elevate the qualifying child's best interests to a level that would effectively eliminate or alter the express comparative standard set forth in the statutory text.[4]

[9] The interests of Petitioner's children were a primary consideration of the IJ in this case. The IJ acknowledged that the children would suffer emotionally if they were forced to separate from their father, but also noted that they would be cared for in this country by their mother or their aunt (whom they currently see almost every day). Those facts, the IJ found, were not "exceptional and extremely unusual" in relation to the hardship faced by the six children in *Recinas*, who were to accompany their single mother to Mexico, where she had no family. The IJ's conclusion does not suggest that the IJ failed to make the interests of Petitioner's children "a primary consideration," but rather that Petitioner demonstrated sadly common hardships that can result when an alien parent is removed and must make the heart-wrenching decision between family unity and the children's ability to enjoy the educational and economic advantages of living in the United States. It is clear from the record, and from the IJ's decision, that Petitioner has a strong and admirable relationship with his children and that the relationship will suffer from Petitioner's removal. But, having considered those interests fully and carefully, the IJ did not act in a manner contrary to international law, nor in a manner contrary to Congress' intent, by concluding that the children's hardships were not "exceptional and extremely unusual."

---

[4]Petitioner relies on *Beharry v. Reno*, 183 F. Supp. 2d 584, 604-05 (E.D.N.Y. 2002), *rev'd on other grounds*, 329 F.3d 51 (2d Cir. 2003). But the district court there held that the Convention's "best interests of the child" standard demanded only what Petitioner got here—a hearing at which the agency considered the child's interests and determined whether they were significant enough to satisfy the statutory standard for relief. *See id.*

CONCLUSION

In sum, we hold that the agency's interpretation of the hardship standard, and its application of the standard in this case, are consistent with the "best interests of the child" principle articulated in the Convention on the Rights of the Child, even assuming that the Convention is "customary international law" and that its dictates are relevant to a proceeding involving deportation of a parent.

PETITION DENIED.

---

PREGERSON, Circuit Judge, dissenting:

The United Nations: Convention on the Rights of the Child, Nov. 20, 1989, 28 I.L.M. 1448, embodies the humane principle that "[i]n all actions concerning children . . . undertaken by . . . courts of law, administrative authorities or legislative bodies, the best interests of the child shall be a primary consideration." Art. 3(1), *Id*. at 1459. The Convention recognizes that the family is "the fundamental group of society and the natural environment for the growth and well-being of all its members and particularly children . . . ." Convention Preamble, 28 I.L.M. at 1457. In short, the Convention espouses our democracy's abiding belief in the overarching importance of the family, particularly its children, and of "family values."

Sadly, our cancellation of removal statute does not honor the concept of family values and the need to keep families together. Under the removal statute, the Board of Immigration Appeals ("BIA") may grant an application for cancellation of removal only where removal would cause "exceptional and extremely unusual hardship" to the petitioner's citizen or lawful permanent resident family members — here, Cabrera-Alvarez's two young United States citizen children, ages eight and ten. 8 U.S.C. § 1229b(b)(1)(D). That onerous standard is

so difficult to satisfy that there is only one published BIA decision that grants cancellation of removal after finding that the requisite "exceptional and extremely unusual hardship" existed. *See Ariadna Angelica Gonzalez Recinas*, 23 I. & N. Dec. 467 (B.I.A. 2002) (concluding that cancellation of removal was warranted because the mother of six children (four of whom were born in America) was the sole means of economic support for her children, had no comparable means of providing for her children in Mexico, had no close family members in Mexico, her ex-husband did not help to support the children, and the children did not speak Spanish and had never traveled to Mexico); *compare Martha Andazola-Rivas*, 23 I. & N. Dec. 319, 324 (B.I.A. 2002) (concluding that while the removal of the single parent of two United States citizen children, ages 11 and 6, would likely result in "extreme hardship" to the children, cancellation of removal was not warranted because the hardship faced by the children would not be "exceptional and extremely unusual"). Our courts, in turn, lack authority to review the BIA's ruling that such hardship does not exist.[1] 8 U.S.C. § 1252(a)(2)(B); *see Romero-Torres v. Ashcroft*, 327 F.3d 887, 891-92 (9th Cir. 2003).

_____

[1]While not briefed by any party, I believe the removal of our jurisdiction raises serious separation of powers problems. In other contexts, we have been told that family unity is a fundamental right protected by the Due Process Clause. *See Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion) ("[T]he interest of parents in the care, custody, and control of their children is perhaps the oldest of the fundamental liberty interests recognized by th[e Supreme Court]."); *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) ("We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected."); *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972) ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children."); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (recognizing that "[t]he integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment").

Congress has delegated to the Executive Branch the unreviewable authority to decide under what circumstances family unity is entitled to

In the case at hand, Cabrera-Alvarez, an agricultural worker, is by all accounts a loving parent and responsible member of his community. Aside from a single conviction in 2002 for driving under the influence, his only crime was entering the United States unlawfully thirteen years ago. Cabrera-Alvarez's young son and daughter, both born in the United States, will undoubtedly suffer severe emotional and economic hardship when their loving father is removed from this country.

I pray that soon the good men and women in our Congress will ameliorate the plight of families like the Cabrera-Alvarezes and give us humane laws that will not cause the disintegration of such families.

---

protection. In so doing, Congress has delegated to the BIA the sole discretion to determine the contours of the fundamental right to family unity. As the Supreme Court recently admonished us in a different context, "the Constitution may well preclude granting 'an administrative body the unreviewable authority to make determinations implicating fundamental rights.' " *Zadvydas v. Davis*, 533 U.S. 678, 692 (2001) (quoting *Mass. Corr. Inst. at Walpole v. Hill*, 472 U.S. 445, 450 (1985)); *see also Crowell v. Benson*, 285 U.S. 22, 87 (1932) (Brandeis, J., dissenting) (stating that "under certain circumstances, the constitutional requirement of due process is a requirement of judicial process")